Peter R. Afrasiabi (Bar No. 193336)
Email: pafrasiabi@onellp.com
John Tehranian (Bar No. 211616)
Email: jtehranian@onellp.com
Jennifer A. Mauri (Bar No. 276522)
Email: jmauri@onellp.com
**ONE LLP**
23 Corporate Plaza Drive
Suite 150-105
Newport Beach, CA 92660
Telephone:  (949) 502-2870
Facsimile:   (949) 258-5081

*Attorneys for Plaintiff,*
*RG Media Properties, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| RG MEDIA PROPERTIES, LLC, a Wyoming limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>BLUMHOUSE PRODUCTIONS, LLC, a Delaware limited liability company; BLUMHOUSE HOLDINGS, LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:25-cv-08926<br><br>**COMPLAINT FOR:**<br>1) **COPYRIGHT INFRINGEMENT; and**<br>2) **BREACH OF CONTRACT/IDEA MISAPPROPRIATION (*DESNY* CLAIM)**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff RG Media Properties, LLC ("Plaintiff" or "RG Media"), by and through its attorneys of record, complains against Defendants Blumhouse Productions, LLC, Blumhouse Holdings, LLC, and DOES 1-10, inclusive (collectively, "Defendants") as follows:

## JURISDICTION AND VENUE

1. This is a civil action against Defendants for their acts of copyright infringement in violation of the United States Copyright Act, 17 U.S.C. §§ 101 *et seq*.

2. This Court has subject matter jurisdiction over this copyright infringement action under 28 U.S.C. § 1331, 17 U.S.C. § 501(a), and 28 U.S.C. § 1338(a).

3. This Court has supplemental jurisdiction over Plaintiff's claim for breach of implied contract (*Desny*) under 28 U.S.C. § 1367.

4. This Court has personal jurisdiction over Defendants. Specifically, Defendants have engaged in direct, contributory, vicarious, and/or otherwise induced acts of copyright infringement in this judicial district, the contract at issue in this case was entered into in this district, the infringements occurred in this district, and Defendants Blumhouse Productions, LLC and Blumhouse Holdings, LLC have their principal place of business/headquarters in this district. Further, Defendants have engaged in continuous and systematic business in California and derive substantial revenues from commercial activities in California. Plaintiff is informed and believes, and upon such alleges, that Defendants have also engaged in a multiplicity of acts directed toward California, including without limitation, regularly and systematically soliciting and engaging in numerous commercial transactions with California-based clients. As a result, besides Defendants' active and purposeful engagement with, and substantial, continuous and systematic business ties to, California and this judicial district, there is a direct and substantial nexus between Plaintiff's claims in this case and Defendants' purposeful availment of the privilege of conducting activities within California and in this judicial district.

5. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a) in that the claim arises in this Judicial District, the Defendants may be found and transact business in this Judicial District, and the injury suffered by Plaintiff took place in this Judicial District. Defendants are subject to the general and specific personal jurisdiction of this Court because of their contacts with the State of California.

## PARTIES

6. Plaintiff is a limited liability company existing under the laws of Wyoming, with its principal place of business in Beverly Hills, California.

7. Plaintiff is informed and believes and, upon such, alleges that Blumhouse Productions, LLC is a limited liability company existing under the laws of Delaware, with its principal place of business in Los Angeles, California. Defendant Blumhouse Productions LLC produced the infringing movie at issue in this complaint.

8. Plaintiff is informed and believes and, upon such, alleges that Blumhouse Holdings, LLC is the parent company of Blumhouse Productions, LLC. Plaintiff is informed and believes that Blumhouse Holdings, LLC is a limited liability company existing under the laws of Delaware, with its principal place of business in Los Angeles, California at the same address. Blumhouse Holdings, LLC on its website (www.blumhouse.com) claims copyright to the content of the website and identifies the movie at issue in this Complaint as one of the movies in its catalogue of movies.

9. DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint and insert the true names and capacities of said Defendants when the same have been ascertained, be it other corporations or individuals. Plaintiff is informed and believes and, upon such, alleges that each of the Defendants designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein alleged, and that Plaintiff's damages as alleged herein were proximately caused by such Defendants.

## STATEMENT OF FACTS

10. Evan Foster wrote the script *Table 18* in 2012.

11. Mr. Foster assigned all rights, title and interest in and to *Table 18*, including but not limited to the copyrights therein and thereto, to RadioactiveGiant Holdings, LLC in 2013.

12. RadioactiveGiant Holdings, LLC subsequently assigned all rights, title and interest in and to *Table 18*, including but not limited to the copyrights therein and thereto, to RG Media in April 2025.

13. RG Media registered the copyright in *Table 18* in July 2025. A true and correct copy of the Copyright Registration Certificate is attached as **Exhibit A.**

14. After vetting Foster's script for commercial viability and promise, Foster's Hollywood agent sought to shop the script to producers in Hollywood in the customary manner: by reaching out, including personally to producers that Foster's agent knew and had worked with in the past, to gauge their interest before delivering the script.

15. In July 2012, Foster's agent contacted Defendants to gauge whether they had an interest in reviewing Foster's script *Table 18* given its idea and story. The agent had a well-established relationship with Defendant Blumhouse given their prior interactions seeking interest, securing the articulated interest, and submitting scripts for others.

16. Neither Foster's agent nor Plaintiff (or its predecessor) sends out scripts on a blind or unsolicited basis; instead, they disclose/provide scripts for review to production companies only if the company expresses a serious interest in reviewing the script for a possible deal, as is customary in the motion picture industry.

17. Indeed, Blumhouse does not accept unsolicited scripts as its website states: "UNSOLICITED SUBMISSIONS Company does not accept any creative ideas, suggestions, or materials in any format that it has not specifically requested (including, but not limited to, unsolicited screenplays, story ideas, concepts, pitch decks, treatments, fan fiction, characters, artwork, other submissions for motion pictures, television programs or other products or services, or any feedback, notes, or suggested

improvements) (collectively, "Unsolicited Submissions"). This is intended to prevent possible future misunderstandings when projects developed by or on behalf of our professional staff or creative partners might seem to others to be similar to their own creative ideas, suggestions, or materials. Therefore, please do not make any such Unsolicited Submissions to us through the Service, by email, or otherwise." (www.blumhouse.com/terms)

18. In July 2012, Defendants via Jessica Hall, a VP of Production at Defendants, (fka Jessica Malanaphy) replied that they were interested in the pitch and reviewing the actual script for a potential deal.

19. Ms. Hall's LinkedIn states that her role as VP of Production included the following, among other, job roles: "Evaluated all submitions [sic]; created and identified new project ideas."

20. *Table 18* was then sent to Defendants for review.

21. Defendants then chose not to pursue the project.

22. Now, years later, without authorization of Foster or Plaintiff, Defendants have chosen to produce, distribute and exhibit a major motion picture, *Drop*, which is substantially, if not strikingly, similar in copyrighted expression to *Table 18*, and also misappropriates the non-copyrightable elements and ideas from the *Table 18* script.

23. *Drop*, which was directed by Christopher Landon, stars Meghann Fahy, Brendon Skelnar, Violett Beane and Jeffery Self.

24. Defendants released *Drop* theatrically in 2025 after premiering it at the South by Southwest (SXSW) festival in March 2025.

25. Defendants also released *Drop* in 2025 on digital streaming services such as, at least, Peacock, AppleTV, Amazon Prime Video, YouTube, DirectTV, Xfinity, and Fandango.

26. Defendants also released *Drop* in 2025 via physical DVD/Blu-Ray discs for sale at national retail outlets such as, at least, Target, Wal Mart, Gruv, and Amazon.

27. Actress Meghann Fahy, who plays the lead role in *Drop*, has publicly stated in an interview with *Entertainment Weekly* that it was the producers of *Drop* that came up with the idea for it. The producers of *Drop* are Defendants.

28. The credited writers of *Drop* are Jillian Jacobs and Chris Roach. Their screenplay for the movie, and all iterations of it, are not publicly available but will be sought in discovery and, based on the information provided in its own copyright registration filed in 2024, establishes that it was written years after *Table 18*.

29. Both Jillian Jacobs and Chris Roach have worked with Defendants since at least 2017 on various screenplay developments, movies, and rights to other works.

30. *Drop* is substantially, if not strikingly, similar to *Table 18* across copyrightable elements on, among other things, the plot, theme, characters, setting, dialogue, and the sequence of events that undergird each story as alleged herein.

31. *Plot*. The plots have the same narrative elements, including without limitation: (1) a domestic set up in a nice home and reluctant departure of the single mother (with a small son), where she is coaxed into going on a first date by her confidante-friend who acts as the babysitter for her child that night. (2) The cat-and-mouse game between the single mother and her first date, all of which occurs in a dark, moody, high-end restaurant at the top of a high rise building at night. The date begins with false starts, in which the single mother mistakes other men at the restaurant as her date, (where her actual male first date is late). (3) During the course of the date, the single mother learns that her child and child's babysitter are being held hostage as collateral in order to force her to complete a task, while at the restaurant. (4) The single mom faces surveillance, coercion, and emotional manipulation rather than brute force throughout, and cannot leave the restaurant while she struggles to find help from restaurant staff. While her attempts are largely unsuccessful, this nonetheless triggers staff suspicions that something is afoot with the couple on their first date. (5) The climax is almost identical in each works—it occurs in the restaurant, in which a physical altercation erupts. The restaurant staff intervene, and the villain lashes out violently. In both cases, the

protagonist delivers the killing blow in a dramatic and symbolic act (shattering a bottle or glass), and the scene is intercut with events back at home, where the caregiver and child are under direct threat. In parallel sequences, the caregiver fends off the assailant using a glass object and a knife—with near-identical choreography in both works. (6) After defeating the primary villain, the protagonist races home, arriving just as the danger that continues to lurk in the domestic sphere peaks. The story ends with a mother–child reconciliation, offering catharsis after emotional trauma.

32. The plots of each work employ a litany of other identical elements within the striking concept of a first date turned hostage situation. For example, both protagonists attempt to covertly signal for help using handwritten notes or gestures. These attempts are intercepted or returned to them, deepening the futility of these efforts. The idea of public cries for help that go unnoticed is a repeated thematic motif in both works. Likewise, each protagonist carries emotional scars from a violent loss—either the murder or suicide of a partner—and the shared trauma of a child who witnessed it. This backstory is used by the antagonist to manipulate guilt, submission, and rage, culminating in the final confrontation. And the parallel narrative of danger unfolding at home is identical in both works. The caregiver with the child becomes a second point of suspense. In both climaxes, the child is defended using the exact same sequence of actions: smashing a glass over the attacker's head, followed by stabbing him with a kitchen knife. Further, before the protagonist meets her date, she has multiple false-starts with other men, as well as having the live music performer at the restaurant interrupting the protagonists' conversations.

33. *Characters*. Each work contains only a small number of significant characters, all of whom are nearly identical: a mother on a first date after the death of her husband, her young child (5-6 years old) at home, the female caregiver at home, the good looking male blind date, and secondary restaurant staff performing similar structural purposes in each story. The characters in *Drop* mirror not only the structure and relationships of the characters in *Table 18* but also replicate the precise expressive

content that gives those characters narrative life. Their arcs, actions, emotional stakes, dialogue patterns, and visual identities are substantially, if not strikingly, similar in ways that go well beyond mere archetypes:

    a. *Mother (Jennifer in Table 18 and Violet in Drop)*. Both Jennifer and Violet are single mothers of a young son, and they are defined by their cautious emotional state and reluctance to re-enter the dating world. They are introduced in nearly identical domestic scenes (playing hide-and-seek with the young boy dressed in blue clothing), establishing a tone of maternal intimacy. Each woman is encouraged to go on a first date by a confidante in their life, despite expressing doubt about her readiness. Both are styled by this confidante in a provocative outfit chosen for them, and both wear their hair up. Both protagonists become trapped in a high-end restaurant by a man who appears charming at first but is ultimately revealed as, or related to, the antagonist. Each woman is psychologically manipulated, forced to remain at the table under threat of harm to her child and caregiver. Both attempt covert resistance—spilling drinks, passing secret notes, and silently signaling others in the restaurant where the date takes place. Each woman reveals emotional trauma connected to a violent past involving a romantic partner who died under suspicious or tragic circumstances. In both stories, the protagonist's child witnessed that death. As a result of this trauma, Jennifer and Violet share not just character function, but a seemingly meek personality, which later erupts in protective, maternal violent behavior. Their expressive qualities are substantially similar in tone, development, and resolution—culminating in physical confrontation, the use of lethal force, and emotional reunion with their sons. These are not general

"everywoman" leads—they are carefully rendered characters with specific narrative identities, copied in full from one work to the other.

b. *Child.* The child in each work is a young boy (Ollie who is 6 years old in *Table 18*, Toby who is 5 years old in *Drop*,) with a mop of blond hair and gentle, trusting temperaments. Both are introduced in the opening scene establishing an immediate emotional bond through a game of hide-and-seek with their mother. Both boys are tied to strikingly similar, traumatic backstories: Ollie witnessed the murder of his father; Toby witnessed his father's suicide. Each child has a distinct physical vulnerability—Ollie is deaf, while Toby requires glasses to see—further intensifying their dependence and narrative fragility. In both stories, the child is placed in danger while the protagonist is forced to remain at a dinner with a perceived dangerous man, making the child's safety the central emotional and moral driver of the plot. Both boys are tied to traumatic backstories: Ollie witnessed the murder of his father; Toby witnessed his father's suicide. These events form the emotional foundation of the protagonist's motivations and guilt. The resolution in each work concludes with the mother returning home to defend and reunite with her child, completing a parallel arc of maternal sacrifice, protection, and emotional redemption.

c. *Perceived Antagonist.* In each work, the male villain antagonist serves the same narrative function and are introduced under virtually identical circumstances. Both appear at first to be the blind date and are later revealed to be the antagonist. Each character weaponizes charm, intelligence, and psychological manipulation to trap the protagonist in a deadly situation. Both taunt her with casual dining behavior while holding her loved-ones hostage. Each antagonist has

an intricate plan involving surveillance, physical entrapment (a bomb under the table or a detonator), and high-stakes psychological warfare. They have a unique narrative presence that, with a level of planning and intricate similar behavior, renders them beyond any stock villain character.

d. *Caregiver of Child.* In each work, it is a confidante of the protagonist who babysits the young boy and encourages the single mother to go on her date. She clearly has a history with not only the mother but also the son, and it is this long-term trust that allows the single mother to go on the date in the first place. The confidante-caregiver is both sassy and supportive, helping the protagonist pick out her outfit, encouraging her to dress more provocatively. Both serve as foils to the protagonist's anxiety and, later, are drawn into the central threat when the villain targets the child, doing what they can to protect themselves and the young boy, but ultimately needing to be rescued by the mother in the end.

e. *Male love interest.* Both characters are also physically shown and described in similar terms—muscular, not too tall, goatee, and "wolfish blue eyes"—adding another layer of specific mirroring between the works. Henry in *Drop* appears as a present character and Oliver in *Table 18* is part of the backstory, and both serve the same symbolic function: they are good men caught in a criminal conspiracy because they were witnesses to corruption. Henry is revealed to be an FBI informant; Oliver was a key witness in a criminal case. Both are killed (or targeted for death) as a consequence, and their relationship to the protagonist is marked by emotional vulnerability and tragic loss.

  f. *Dead Father.* In both stories, the single mother and the child are haunted by a dead father figure, who died in violent circumstances, traumatizing both of them. Both stories see the single mother characters grappling in the wake of this loss, and both see the young boy similarly dealing with the gap left by the father's death. The dead father figure is explicitly brought up in both stories to highlight the vulnerabilities of the mother and son. Furthermore, the father becomes the motivation for the cathartic conclusion in which the mother takes matters into her own hands. Her character arc goes from passivity as the direct result of the specter of her dead husband, to now taking action in the face of abuse and disfunction.

  g. *Restaurant staff.* As a social unit, the restaurant staff serve a strikingly similar role in each story: the snobby and constantly interrupting waiter and the live musical performer are the most striking parallels. Paradoxically, they make the single mother feel safer with their attentiveness and growing concern that the date isn't going well, yet don't respond to the single mother's various attempts to signal them for help. They provide comedic relief at times, and also ratchet up the drama and feelings of frustration.

34. *Setting.* The setting is identical across each work. The home, which features the opening and ending scenes at a single mother's well-appointed home, bookends the story. The primary action takes place in an upper-echelon restaurant featuring foreign cuisine that sits atop a high rise building at night where a few scattered offices are lit up with a fully illuminated top floor. Within the restaurant, the table itself functions as the primary setting of the story, which the single mother is forced to sit at while her young son is held hostage back at her home. Both restaurants feature talkative, snooty waiters and live music playing. The restaurant setting and ambience in both works is dark and

moody with a panoramic view of the city with an elevated stage with live ambience music.

35.     *Theme*. The themes in both stories are essentially identical. (A) The tension is rooted in the same core dramatic question: How far will a mother go to protect her child while appearing normal in public? And is it safer to capitulate to threats or resist? (B) These notions point to the broader concept that the quest for love is dangerous and inherently a risk. This complicates the notion of victim and aggressor: *the victim becomes the aggressor.* (C) In both stories, surveillance is weaponized to instill paranoia rather than security, and the dining table itself becomes a literal and symbolic prison. In *Drop*, it is chosen by the villain and leaving it will trigger harm. In *Table 18*, it is rigged with a bomb set to detonate if the protagonist moves. This metaphor of being "trapped at the table" and having to maneuver to save one's child in the confines of a ritzy restaurant is distinctive and central to both narratives. (D) Both stories carry a revenge theme as well: in the script, Jennifer is out to get the killer of her husband, and in *Drop,* the mother character kills the villain as an act of vengeance for threatening her son. This implicitly carries the idea that single mothers can succeed in building families and parenting and even protecting their children from violence without the aid of men.

36.     *Dialogue*. Both works involve identical dialogue of the same character telling the female protagonist that she needs "to get laid" and to "have fun." Other dialogic similarities also exist, including without limitation: the friend commenting on the protagonist's chosen outfit; the protagonist's expressed doubt about the date and the friend disagreeing and picking out a low-cut dress; the protagonist talking to herself in the elevator as she goes up to the restaurant; wine recommendations from the staff are offered the protagonist alone; similar verbiage to describe the date as having a goatee, not too tall, possible mustache, blue eyes, and connected to French culture; the male date apologizes for being late; the male date orders medium cooked meat, and only one side dish is ordered with him asking if the other will share the side; the protagonist threatens to go to the police.

37. *Mood*. The mood between both works is strikingly similar. Both are tense thrillers interspersed with wry comedic beats, drawn from relatable aspects of an awkward first date, which juxtapose a high stakes hostage situation with the mundane details of ordering food at a restaurant. Both stories take place in a darkened restaurant at night, bookended by home life, all in a suspenseful game of cat-and-mouse where the audience is trying to assess if the date is the threat or not.

38. *Sequence of events*. As described above and in even more detail in **Exhibit B's** comparative analysis of the scene breakdown on the sequence similarity (and other substantial similarity elements), the two works are substantially, if not strikingly, similar in terms of the sequence of events. The opening scene in which the mother plays hide-and-seek with her young son is nearly identical in function and visual details, down to the clothing color and tone. The manner in which the caretaker preps the single mother character for her date is also strikingly similar. When the single mother arrives at the restaurant, her date is late in both, after which she tries to guess who her date is, leading her night off to several false starts. When the single mother checks on her son and his babysitter, the caregiver is giving the young son ice cream which functions as a symbol of rebellion while the mother is away. When the single mother finally meets her date, the approach is the same in both stories: flirtatious discomfort which both builds tension and allows for an organic revealing of the mother's backstory. The waiter appears early on in both stories, and functions as a recurring dramatic foil – used to intensify the extremity of this hostage situation. Later on, the live musical performer is similarly used to spike the anxiety of the date. Once the trap is set, both single mothers attempt to discretely call for help. In *Table 18*, Jennifer tries to nonverbally ask for help by signaling to a deaf person with her hands, and in *Drop*, Violet tries to write on her hand to signal for help. Both single mothers attempt to spill a drink as a distraction, in an identical device used to shift focus and attempt covert action while under watch. Later, they both attempt to write notes: Jennifer sends a disguised note to the restaurant staff, which is intercepted, and Violet also sends a disguised note to the restaurant staff, which is similarly intercepted

and returned to her with a warning. Throughout all these attempts by the single mother to escape her dangerous date and help her son and babysitter, held hostage, the restaurant staff grows increasingly suspicious, eventually intruding on the date. In both, the maître d' himself checks on the single mothers to make sure everything is okay. In both stories other various members of the restaurant staff attempt to intervene as well. In both stories, the single mother character is pressured to kill her date, and it is either explicitly stated or inferred that she is capable of doing this because she has killed before. Jennifer and Violet also both threaten to go to the police, a verbal assertion of their rights and power which appear at the same structural point in both works. Jennifer and Violet also both force the antagonist to swallow something dangerous, which acts as a reversal of the existing power dynamic. Both protagonists share a parallel, traumatic backstory, revealed over the course of the story, in which the father of their child died untimely deaths, impacting not only the now single mother but their young sons. During the climax of the story, the villain lashes out publicly, in the crowded restaurant, in a violent manner, injuring or killing the restaurant staff. In the end, the final kill, delivered by the single mother character in both stories, is a visually dramatic and symbolically charged moment – an emancipatory, thrilling and permanent shift for the central character. Once this happens, the single mothers in both have to race home in order to save their young sons and babysitter from the man holding them hostage in her home. Both mothers live close enough in proximity to the restaurant to enable this to happen quickly. The stories conclude with a mother and son resolution, each featuring an identical emotional beat in which the film ends with a mother-son embrace signaling relief and an unbreakable bond

39. Thus, *Drop* incorporates myriad copyrighted elements from *Table 18* across the multiple touchstones described above, rendering the work substantially, if not strikingly, similar to *Table 18*.

40. *Drop* also unlawfully misappropriates myriad ideas and themes from *Table 18*, including the elements detailed above.

# FIRST CLAIM FOR RELIEF

## *Copyright Infringement Against All Defendants*

41. Plaintiff repeats, realleges, and incorporates the foregoing allegations herein by reference as if fully set forth herein.

42. Plaintiff is the owner by copyright assignment of the copyright in and to an original work, *Table 18*, that is fixed in tangible media of expression.

43. Plaintiff registered the script for *Table 18*, Registration No. TXu 2-499-213, with the United States Copyright Office, with an effective registration date of July 21, 2025.

44. Defendants gained direct, actual and documented access to the *Table18* Script in or around July 2012.

45. At no time did Plaintiff ever give consent, offer permission or grant a license to Defendants for the commercial exploitation of the *Table 18* Script under any circumstances, including as the basis for the movie *Drop*.

46. Defendants have produced, distributed and exhibited the motion picture titled *Drop* which is substantially, if not strikingly, similar to *Table 18*. Defendants' acts therefore violate Plaintiff's exclusive rights under the Copyright Act, 17 U.S.C. §§ 106 and 501, including, but not limited to, Plaintiff's exclusive rights to reproduce, distribute, publicly display and publicly perform its work and make derivatives thereof.

47. In particular, Defendants infringed Plaintiff's copyright in *Table 18* by reproducing, distributing, publicly displaying, publicly performing and derivatizing *Drop* (and related works, such as commercials or trailers) in the United States and abroad.

48. *Drop* is substantially, if not strikingly, similar to *Table 18*. *Drop's* plot and sequence of events, themes, characters, character relationships and development, dialogue, setting, and mood and pace are substantially, if not strikingly, similar to *Table 18*, as detailed herein.

49. These substantial, if not striking, similarities, in addition to the many others, also establish that Defendants copied *Table 18* and further relied on their possession of and access to *Table 18* when they produced *Drop*.

50. Any differences between *Drop* and *Table 18* are dwarfed by the overwhelming similarities between the works.

51. Defendants copying, duplication, use, and exploitation of *Table 18* in creating *Drop* constitutes direct infringement of Plaintiff's copyright in the work, *Table 18*.

52. In addition, Defendants, without the permission or consent of Plaintiff, have knowingly encouraged, induced, materially contributed to, and/or facilitated the unauthorized reproduction, derivatization, distribution, public performance and public display of Plaintiff's work, and have the right and ability to stop or limit the infringement and a direct financial interest in such infringing activities.

53. As such, Defendants are directly, vicariously, and/or contributorily infringed Plaintiff's copyright, and unless enjoined, will continue to infringe Plaintiff's copyright by reproducing, derivatizing, distributing, publicly displaying and publicly performing the movie *Drop* for purposes of trade without authorization of or payment to Plaintiff in violation of 17 U.S.C. § 501 *et seq*.

54. Defendants' infringing acts were willful, deliberate, and committed with prior notice and knowledge of Plaintiff's copyrighted work.

55. Defendants' wrongful acts have caused, and are causing, great injury to Plaintiff, of which damages cannot be accurately computed, and unless this Court restrains Defendant from further commission of said acts, Plaintiff will suffer irreparable injury, for all of which it is without an adequate remedy at law. Accordingly, Plaintiff seeks a declaration that Defendants are infringing Plaintiff's copyrights and an order under 17 U.S.C. § 502 enjoining Defendant from any further infringement of Plaintiff's copyright.

56. As a result of Defendant's wrongful acts alleged herein, Plaintiff has suffered and is suffering substantial damage to its business in the form of diversion of trade, loss of profits, injury to goodwill and reputation, and the dilution of the value of its rights, all of which are not yet fully ascertainable, but will be the subject of discovery for a damages award under 17 U.S.C. § 504(b).

57. As a result of Defendants wrongful acts alleged herein, Defendants have profited in an amount presently unknown from its exploitation of *Drop* but which will be the subject of discovery as Plaintiff is entitled to such damages under 17 U.S.C. § 504(b).

## SECOND CLAIM FOR RELIEF

*Breach of Implied Contract/Idea Misappropriation—Desny Idea Theft Claim*

*Against All Defendants*

58. Plaintiff re-alleges and incorporates here by reference the allegations in Paragraphs 1 through 40.

59. Agents contacted Defendants to pitch *Table 18*. Defendants through their sophisticated VP of Production, as outlined above, agreed to consider it and asked to see the *Table 18* script. Defendants disclosed the script, and the ideas and themes contained therein, expressly with the expectation and understanding that if the idea and property was chosen to be developed, there would be payment. Such disclosure was made under circumstances from which it could be reasonably be concluded that Defendants accepted the disclosures knowing the conditions on which they were provided and the reasonable value of the ideas and themes embodied in the script. As is customary in the industry, when a movie production solicits an idea, script or screenplay, each of the parties know and understand that any use of said idea and property is ultimately permitted only with a formalized contract and agreed-upon compensation—here Defendants fully expected that they would pay and Plaintiff would expect payment of the idea was to be taken and used. Indeed, the agent reached out specifically because that is the mechanism by which ideas for future production are shared, upon acceptance of a requesting party to submit the idea for development by the party receiving, and agreeing to receive, the full idea embodied in

the script that is central to its business of developing ideas and scripts into movies. The agent never just delivered the script to Defendants freely, as in the case of someone who just blurts out an idea. The agent was sophisticated and acted within all customary Hollywood mechanisms for submission of ideas for consideration by studios for development.

60. Plaintiff's agents, on the one hand, and Defendants, on the other, engaged in this exchange of the idea, materials and information with the bilateral expectation, fully and completely understood, that if Defendants pursued the literary ideas of *Table 18*, Plaintiffs would be included in the project and would be fairly compensated for the reasonable value of its contribution.

61. Plaintiff invested significant time and money in acquiring and trying to develop the idea of the *Table 18* script, as had the script's author who wrote it originally.

62. Plaintiff justifiably expected that Defendants would not pursue *Table 18* or its ideas into a movie without permission from Plaintiff, and furthermore, justifiably expected to be included in the pursuit of any such idea development and fairly compensated for the reasonable value of the ideas.

63. Defendants breached this implied agreement, as recognized under *Desny v. Wilder*, 46 Cal. 2d 715 (1956) and its progeny, when it exploited *Table 18* and its ideas for its own use, including with the production, distribution and exhibition of the motion picture *Drop*, without Plaintiff's consent, and failed to provide Plaintiff with the benefits of the valuable matters taken by Defendants.

64. Defendants took and appropriated the property at no cost to themselves.

65. As a proximate result of Defendant's breach, Plaintiff has lost royalties and profits on *Table 18* and derivatives thereof, the idea itself, development investments in the property, reputation and brand value in public development of the property, and other related *Table 18* derivative opportunities, and suffered other damages, in an amount to be proven at trial.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, and each of them, as follows:

1. Against Defendants, for damages in such amount as may be found, or as otherwise permitted by law, including without limitation Plaintiff's actual damages and recovery of Defendants' wrongfully gained profits, under 17 U.S.C. § 504(b);

2. Against Defendants, for an accounting of, and the imposition of a constructive trust with respect to, Defendants' revenues, benefits, income, profits, receipts, and other benefits attributable to their infringements of Plaintiff's copyrights in *Table 18*, domestic and foreign included;

3. Requiring Defendant to account for and pay over to Plaintiff all profits derived by Defendant from its acts of copyright infringement and to reimburse Plaintiff for all damages suffered by Plaintiff by reasons of Defendant's acts, pursuant to 17 U.S.C. §§ 504 (a)(1) and (b).

4. Against Defendants, for actual damages in connection with idea misappropriation under *Desny*;

5. For costs and interest pursuant to, inter alia, 17 U.S.C. §§ 504(a)(1) & (b) and 505;

6. For prejudgment interest according to law;

7. For such other and further relief in favor of Plaintiff as the Court may deem just and proper.

Dated: September 18, 2025         **ONE LLP**

By: */s/ Peter R. Afrasiabi*
Peter R. Afrasiabi
John Tehranian
Jennifer A. Mauri

*Attorneys for Plaintiff,*
*RG Media Properties, LLC*

# DEMAND FOR JURY TRIAL

Plaintiff RG Media Properties, LLC hereby demands trial by jury of all issues so triable under the law.

Dated: September 18, 2025   **ONE LLP**

By: */s/ Peter R. Afrasiabi*
    Peter R. Afrasiabi
    John Tehranian
    Jennifer A. Mauri

*Attorneys for Plaintiff,*
*RG Media Properties, LLC*

**COMPLAINT**